80 F.3d 485
 151 L.R.R.M. (BNA) 2877, 317 U.S.App.D.C.
9, 64 USLW 2623,
131 Lab.Cas. P 11,558
 DIAMOND WALNUT GROWERS, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Cannery Workers, Processors, Warehousemen and Helpers, Local
601, and International Brotherhood of Teamsters,
AFL-CIO, Intervenors.
 No. 95-1075.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 17, 1995.
Decided March 29, 1996.
 
 On Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board.
 Robert G. Hulteng, San Francisco, CA, argued the cause for the petitioner. Robert Leinwand, New York City, was on the brief.
 Vincent J. Falvo, Jr., Utica, NY, National Labor Relations Board, argued the cause for the respondent. Linda R. Sher, Euclid, OH, Associate General Counsel, Aileen A. Armstrong, Washington, DC, Deputy Associate General Counsel, and Peter D. Winkler, Phoenix, AZ, National Labor Relations Board, were on brief. Julie B. Broido, Pittsburgh, PA, and Linda Dreeben, Washington, DC, National Labor Relations Board, entered appearances.
 Kirsten S. Spalding argued the cause for the intervenors. Kenneth C. Absalom and Judith A. Scott were on brief.
 Robert E. Williams and Daniel V. Yager were on brief for amicus curiae Labor Policy Association.
 Before: WALD, SENTELLE and HENDERSON, Circuit Judges.
 Opinion for the court filed by Circuit Judge HENDERSON.
 Opinion dissenting in part and concurring in part filed by Circuit Judge WALD.
 KAREN LECRAFT HENDERSON, Circuit Judge:
 
 
 1
 Amidst a bitter economic strike and at the union's direction, a small group of striking union activists crossed the picket line and temporarily returned to work, within days of a rerun representation election, for the announced purposes of campaigning for the union among replacement workers and monitoring the employer's pre-election conduct. In deciding which jobs to give the crossovers, the employer took into account the risk that they could be drawn into potentially violent confrontations with replacement workers as well as the risk that they could engage in production tampering or sabotage or otherwise disrupt the employer's business operation. The National Labor Relations Board (Board) found that the employer had committed an unfair labor practice by discriminatorily assigning the returning strikers to positions that paid less than available ones for which they were qualified, the employer having failed to establish a legitimate and substantial business justification for the job assignments it made. Accordingly, the Board ordered the employer to make the strikers whole. It also ordered that the scheduled rerun election be run yet again. We disagree and grant the employer's petition for review.
 
 I. Background
 A.
 
 2
 Diamond Walnut Growers, Incorporated (Diamond) processes and packages walnuts at its plant in Stockton, California and then ships them to national and international markets. The work force consists of permanent year-round employees supplemented by seasonal hires during the harvesting season in September and October. For decades Diamond voluntarily recognized Cannery Workers, Processors, Warehousemen & Helpers Local 601 of the International Brotherhood of Teamsters (Union) as the employees' representative and had a collective bargaining agreement with the Union, the most recent one expiring in June 1991. In September 1991, the start of the peak season, nearly 500 permanent and seasonal employees struck without notice. In response to the economic strike Diamond hired replacement workers, most of whom remain Diamond employees today. The well-publicized strike was marked by violence as well as Union-led campaigns to boycott Diamond both in the United States and abroad.
 
 
 3
 About a year into the strike a representation election was held to determine whether to certify the Union as the employees' exclusive representative. The Union lost the election decisively and then filed objections, prompting the Board to order that a rerun election be held on October 7-8, 1993. The case centers on Diamond's conduct immediately preceding the rerun election.
 
 B.
 
 4
 On the morning of September 20, 1993, seventeen days before the scheduled rerun election, a group of Union supporters arrived at the plant's main gate without notice. The group consisted of several striking Union activists led by William Freitas, a Union official. The group was escorted to a meeting with Vince Brown and Wendy Heinze, two members of Diamond's management. Freitas began the meeting by handing to Brown and Heinze a letter from the Union lawyer which stated in relevant part:
 
 
 5
 Several of the strikers share the Union's conviction that because of Diamond management's blind determination to break the Union ... a fair election is simply impossible at this point.
 
 
 6
 Nevertheless, because a rerun election is to be held, these employees feel that it is important that the replacement workers ... have an opportunity to hear from Union sympathizers, an opportunity denied them last year because few worked with them or attended the mandatory employee meetings in which management personnel campaigned.
 
 
 7
 Accordingly, the [four] strikers listed below have decided to cease their strike-related activities and have authorized me to inform you that effective upon delivery of this letter, they are available and willing to return to immediate active employment....
 
 
 8
 Joint Appendix (JA) 704-05. Brown explained that only seasonal positions were available and that the returning strikers, like earlier crossovers, must sign a release form. Freitas said he had to consult with the Union lawyer to see if the form was acceptable. Freitas also instructed Brown and Heinze that all communication between Diamond and the four returning strikers was to be conducted through the Union. Later that afternoon Diamond received by courier executed release forms from three of the four strikers, including Willa Miller. The following day the Union notified Diamond by letter that, pursuant to the above-quoted letter from the Union lawyer, strikers Alfonsina Munoz and Mohammed Kussair also were willing to return to work.
 
 
 9
 The Union's pre-election strategy placed Diamond in a difficult position. Operating at its peak season, Diamond faced the prospect of Union-sponsored activists temporarily returning to work shortly before a representation election, not to earn a paycheck, but to campaign and monitor. Diamond was concerned for the safety of both the Union activists and the replacement workers: During the strike replacement workers had been the targets of violence, vandalism and threats and the replacements had openly expressed their resentment and hostility toward the Union and its striking members. In addition, Diamond was concerned that the Union activists might try to sabotage the plant, tamper with its product or otherwise disrupt its operation: The Union had engaged in an international boycott campaign to damage Diamond economically, a campaign which involved not only criticism of Diamond but disparagement of its product as contaminated and unfit to eat (e.g., Union activists had distributed a leaflet stating that Diamond was "looking the other way" while "scabs" packaged walnuts with mold, dirt, oil, worms and debris).
 
 
 10
 Diamond agreed to let the Union activists return to work even though the strikers had no right to reinstatement under the National Labor Relations Act (Act) in that neither their former positions nor substantially equivalent ones were available.[1] See Rose Printing Co., 304 N.L.R.B. 1076, 1991
 
 
 11
 WL 197152 (1991). But in light of its concerns Diamond decided to place the returning strikers--none of whom requested a specific job assignment--in non-sensitive positions, i.e., positions that were well supervised, not isolated and did not allow them to move around the plant during work hours. Accordingly, the company decided to assign Miller to a seasonal packing position (filling cases with packages of walnuts weighing less than one pound each) and Munoz and Kussair to seasonal positions in the growers' inspection department (cracking and inspecting nuts at the front end of the production process). Their jobs were supervised and required them to remain in their work areas. Only Kussair complained about his placement. He asked to be reassigned as a loader but then quit before Diamond could transfer him.
 
 
 12
 When the strikers returned to the plant they carried on their campaigning and monitoring and reported their activities and observations to Union officials and to the Union lawyer--after each shift, according to Miller.
 
 
 13
 The representation election took place as scheduled on October 7-8 and once again the Union lost. After casting their ballots Miller, Munoz and Kussair, who had intended all along to return to the strike after the vote,[2] submitted identical form letters of resignation drafted by the Union lawyer and rejoined the strike.[3]
 
 C.
 
 14
 After the election the Board's General Counsel filed a complaint alleging that Diamond had engaged in unfair labor practices in the pre-election period, namely that Diamond had violated sections 8(a)(3) and 8(a)(1) of the Act by failing to assign Miller, Munoz and Kussair to certain seasonal positions for which they were qualified: Miller as a quality control assistant, Munoz as a lift truck driver and Kussair as a loader.[4] After a hearing the administrative law judge (ALJ) found that the General Counsel had failed to establish a prima facie case of discrimination because Diamond was not obligated to reinstate the strikers. The ALJ, quoting Rose Printing, 304 N.L.R.B. at 1076, declared that " 'an employer's obligation to reinstate former economic strikers extends only to vacancies created by the departure of replacements from the strikers [sic] former jobs and to vacancies in substantially equivalent jobs, but not to any other job which a former striker is or may be qualified to perform.' " JA 25.
 
 
 15
 The Board reversed. Diamond Walnut Growers, Inc., 316 N.L.R.B. 36, 1995 WL 25644 (1995). The Board found that Diamond had discriminated against Miller, Munoz and Kussair because, although the company "was under no legal obligation ... to reinstate the strikers ..., once it voluntarily decided to reinstate them, it was required to act in a nondiscriminatory fashion toward the strikers." Id. at 38. The Board further found that Diamond had failed to establish a substantial and legitimate business justification for its action. The Board ordered Diamond to make Miller, Munoz and Kussair whole for any losses suffered and to post a remedial notice. The Board also set aside the October 1993 election and ordered yet another rerun election, which has yet to take place. Diamond petitions for review and the Board cross-petitions for enforcement of its order.
 
 II. Legal Standards
 
 16
 Workers have a statutory right to organize and strike, 29 U.S.C. §§ 157, 163, and an economic striker retains his status as an employee so long as he has not obtained any other equivalent work. Id. § 152(3). An economic striker who tenders an unconditional offer to return to work has a right to reinstatement only if a vacancy exists in his former position or a substantially equivalent one; he does not have a right to reinstatement to any other job for which he may be qualified. See generally Rose Printing Co., 304 N.L.R.B. at 1076-78. Although an employer has no obligation to reinstate an economic striker to a vacant job that is not substantially equivalent to his former job, the striker nevertheless is entitled to nondiscriminatory treatment when he applies for any job for which he is qualified; an employer cannot prefer a new applicant to the striker solely because the latter went on strike and continues to support the union. Id. at 1078; see also Laidlaw Waste Sys., Inc., 313 N.L.R.B. 680, 681, 682, 1994 WL 57456 (1994).
 
 
 17
 An employer's discriminatory treatment of former strikers may have either a "comparatively slight" or "inherently destructive" effect on employee rights. Boilermakers Local 88, 858 F.2d at 761-62. The Board appears to concede that Diamond's conduct had at most a comparatively slight adverse effect on protected activity.[5] In a "comparatively slight" case the employer must establish a legitimate and substantial business justification for its conduct in order to avoid an unfair labor practice charge. NLRB v. Fleetwood Trailer Co., Inc., 389 U.S. 375, 378, 88 S.Ct. 543, 545-46, 19 L.Ed.2d 614 (1967); NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 34, 87 S.Ct. 1792, 1797-98, 18 L.Ed.2d 1027 (1967). If the employer can do this, the General Counsel must then affirmatively establish that the employer's conduct was motivated primarily by an anti-union animus. Fleetwood, 389 U.S. at 380, 88 S.Ct. at 546-47. Great Dane, 388 U.S. at 34, 87 S.Ct. at 1797-98. We do not disturb the Board's factual findings if they are supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(e).
 
 
 18
 III. Substantial and Legitimate Business Justification for
 
 Placement of Miller and Munoz
 
 19
 In response to the General Counsel's charge of unlawful discrimination, Diamond argued that it was justified in its placement of Miller and Munoz because of the unusual circumstances of their return and the risks their return raised. As discussed below, the record allows for only one reasonable conclusion: Diamond established substantial and legitimate business justifications for Miller's and Munoz's job assignments.
 
 A.
 
 20
 We first emphasize what this case does not present. This is not a failure-to-reinstate case. Nor is it a case involving retribution for strike-related conduct; nor is it about the treatment of a former striker who either seeks reinstatement after the strike is over or withdraws his support of the strike and crosses the picket line in order to earn a living. Rather, the case involves an employer's accommodation of striking union activists who, at the union's direction and with the union lawyer's guidance, sought to return to work temporarily--during the employer's peak season, in the midst of an ongoing strike and shortly before a second representation election--in order to persuade replacement workers to support the union and to monitor the employer's pre-election conduct.
 
 
 21
 With the strike ongoing and the second election imminent, Diamond was greeted by, in the ALJ's words, a "union delegation" made up of activists led, not by a local official, but by an official of the International Brotherhood of Teamsters. JA 22. They handed Diamond management a letter from the Union lawyer giving notice that the activists wanted to cross the picket line to campaign for the Union among replacement workers. Diamond was directed not to communicate directly with the Union emissaries (Diamond's own employees); instead all communications were to go through the Union. The Union lawyer was omnipresent: he drafted the letter, approved Diamond's release form, received reports after the activists returned to work and prepared the form letters of resignation they submitted after casting their votes. In short the returning strikers and the Union spoke with one voice. From the perspective of a reasonable employer in Diamond's shoes the strikers sought temporary access to the work place, and work force, as Union envoys, albeit "employees" within the meaning of the Act. Cf. NLRB v. Town & Country Elec., Inc., --- U.S. ----, 116 S.Ct. 450, 133 L.Ed.2d 371 (1995) (holding that worker can be "employee" within Act notwithstanding union's simultaneous "employment" of worker to help organize company).[6]
 
 
 22
 Further, the strikers did not cross the picket line to earn a paycheck. For one thing, from the beginning the strikers did not intend to remain past the election. Supra note 2. For another, the letter Diamond received from the Union delegation made clear the purpose of their return: so that replacement workers could "have an opportunity to hear from Union sympathizers." Indeed, a local newspaper (The Stockton Record ) contemporaneously ran a story entitled, "Diamond strikers to lobby for union vote." JA 672. The story opened with this description of the event: "With a crucial vote on union representation just over two weeks away, three striking Diamond Walnut workers will be going back to work ... to keep tabs on the company's campaign tactics and urge replacement workers to vote to keep the union." In that story a Teamsters strike coordinator, who equated the returning strikers to "Daniel going into the Lion's den," described the purpose of their return: "[W]e [the Teamsters] feel that we need people who can monitor the company's conduct during the election and present the union's side to the replacement workers." Id.
 
 
 23
 From Diamond's perspective the return of the Union activists--immediately before a representation election which threatened the replacement workers' continued employment--presented a high risk of unrest if not renewed confrontation. Strikers had previously physically assaulted replacement workers, verbally attacked and threatened them and vandalized their property, including their residences. See Diamond Walnut Growers, Inc., 312 N.L.R.B. 61, 64-66, 1993 WL 356124 (1993) (detailing incidents occurring earlier during strike and noting that restraining orders had issued against both strikers and replacements). In turn replacement workers had posted in the plant placards critical of the Union and its strikers. Vince Brown, Diamond's Director of Human Resources and one of the officials who decided where to place the returning strikers, testified that, on learning of the return of the Union activists, the replacements were angry and made comments like, "[G]ee, what happened if they fell down in the rest room or in the locker room" and "Boy, I bet you won't send them back to bulk storage." JA 200. Replacement worker Sonja Bubeck testified that her fellow replacements resented the strikers, especially those who came to the plant to campaign for the Union. In fact, Bubeck urged replacement workers to remain calm.[7]
 
 
 24
 Diamond further feared that the returning strikers could engage in product tampering, sabotage or otherwise disrupt the company's operation. Miller and Munoz had already participated in a well-publicized cross-country tour urging a national Diamond boycott, a campaign dramatically disparaging Diamond's product. Strikers on the tour distributed leaflets charging that Diamond had hired unqualified replacement workers who allowed contaminated and inedible walnuts--with mold, dirt, oil, worms and debris--to be marketed.[8] Besides its fear that Miller and Munoz might try to make the charges ring true (e.g., by adulterating Diamond's product), Diamond knew Miller's and Munoz's track record of attempting to damage Diamond economically. Consequently Diamond was concerned that once inside the plant the activists could wreak economic havoc by delaying production or otherwise disrupting its operation during peak season.
 
 
 25
 To sum up, Diamond faced multiple risks in deciding whether to reinstate the strikers, employees who, as the Board concedes, had no statutory right to reinstatement in that neither their former positions nor substantially equivalent ones were available. And Diamond had a substantial and legitimate interest in minimizing the risks. To that end the company placed Miller and Munoz in supervised positions (a supervisor could defuse a violent incident) that did not allow them to roam about the plant but that nonetheless gave them access to replacement workers (they could approach replacement workers during breaks or in their own work areas). Although Miller was qualified to fill a vacancy in the quality control department, Diamond had a legitimate reason not to place her there: quality control involved inspecting nuts for defects, the final step in the production process before shipping. An unenthusiastic or inattentive worker there could allow defective or contaminated nuts to be marketed or, worse, deliberately adulterate the product. As for Munoz, although she was qualified to fill a vacancy as a lift truck driver, Diamond legitimately decided not to put her behind the wheel of the 11,000-pound vehicle. Not only did the lift truck driver move about the plant unsupervised, the truck itself, with an inattentive operator, could cause damage inside the plant. In addition, because the lift truck was an integral part of a production process that was constrained by tight shipping schedules, an inattentive operator could cause production delay.
 
 
 26
 Viewing the totality of the circumstances of record, we conclude that Diamond established substantial and legitimate business justifications for its placement of Miller and Munoz. In so concluding, we note the Board's reasoning in Sunland Constr. Co., Inc., 309 N.L.R.B. 1224, 1992 WL 390105 (1992):
 
 
 27
 In our experience, when a company is struck it is not "business as usual." The union and the employer are in an economic battle in which the union's legitimate objective is to shut down the employer in order to force it to accede to the union's demands. The employer's equally legitimate goal is usually to resist by continuing production.... Thus, an employer faced with a strike can take steps aimed at protecting itself from economic injury.... Consistent with these principles, we believe that the employer can refuse to hire, during the dispute, an agent of the striking union.
 
 Id. at 1230-31.[9]
 B.
 
 28
 The Board painted a different, and incorrect, picture. First, it emphasized the lack of evidence that Miller, Munoz and Kussair personally had attacked or harassed replacement workers or that the replacements were more resentful of Miller, Munoz and Kussair than of other strikers. We do not agree that such evidence is required to create the risk that replacement workers could retaliate against or otherwise vent their anger on the most available Union activists. Especially in light of Brown's and Bubeck's testimony, as well as Bubeck's letter, there is no substantial evidence to support the Board's finding that replacements did not harbor hostility toward the returning strikers.
 
 
 29
 Second, the Board points out that the strike-related violence, threats and vandalism occurred in the early stage of the strike and had long since ceased by the time the activists returned to work in September 1993. Even were we to agree with the Board that strike-related threats and vandalism had ceased long before September 1993, that circumstance in no way took away from Diamond's concern, supported by the record, that replacement workers continued to harbor resentment. The hiatus of calm may have decreased the likelihood that strikers would engage in violence but the record does not support the Board's conclusion that the replacement workers had short memories. In September 1993 the strike was still on and a second representation election was around the corner.
 
 
 30
 Finally, the Board emphasized that Diamond did not supervise Munoz as she campaigned during breaks and did not establish that it supervised the other returning strikers during their breaks. "Therefore," the Board concluded, "the potential for violence against the strikers by the replacements existed even in the jobs to which they were assigned." Diamond Walnut, 316 N.L.R.B. at 38-39 n. 11. Granted, Diamond did not attempt to reduce the risk of violence to a zero probability. But does the Board really suggest that it would have found Diamond's actions lawful if Diamond had imposed stricter conditions on the returning strikers? Had Diamond done so, it might well have risked an unfair labor practice charge for attempting to influence the outcome of the election. The Board's all-or-nothing approach is of cold comfort to an employer attempting to balance its business interests and the statutory rights of its employees.
 
 
 31
 The Board also discounted the risk of product tampering, sabotage or disruption, concluding that any earlier disparagement of Diamond or its product constituted protected activity under the Act. Id. at 39. Perhaps, and perhaps the disparagement would not have warranted a refusal to reinstate either Munoz or Miller. The issue before the Board, and us, however, is this: in light of their previous efforts to weaken Diamond economically and their continued obeisance to the Union's similar objective, was there a reasonable risk that once inside the plant they might again do something to damage Diamond? If so, could Diamond weigh that risk, together with a risk of violence or other disruption, in determining temporary job assignments within days of the election? We conclude that the clear answer is "yes."
 
 C.
 
 32
 Because we conclude that Diamond proffered substantial and legitimate business justifications for its assignments of Miller and Munoz, the Board must establish affirmatively with independent evidence (i.e., other than the discriminatory conduct) that Diamond's job-placement decisions were primarily motivated by an anti-union animus. See generally NLRB v. Brown, 380 U.S. 278, 286-90, 85 S.Ct. 980, 985-88, 13 L.Ed.2d 839 (1965); American Ship Bldg. Co. v. NLRB, 380 U.S. 300, 312-13, 85 S.Ct. 955, 964, 13 L.Ed.2d 855 (1965). We see no reason to remand on this issue for, in our view, the record does not allow a finding that Diamond primarily intended "to discourage union membership or otherwise discriminate against union members as such." Id. at 312, 85 S.Ct. at 964. Diamond's decisions were made to protect its business interests; indeed, "the record contains positive evidence of the employer['s] good faith." Brown, 380 U.S. at 290, 85 S.Ct. at 987. Diamond quickly reinstated the Union activists, who had no statutory right to reinstatement at the time,[10] gave them the opportunity to campaign for the Union in the work place and among replacements and allowed them to monitor activities inside the plant. Diamond even allowed Union officials to tour the plant and post literature as often as twice a day (up to two hours per tour), JA 233-34, while under no legal obligation to do so. See Lechmere, Inc. v. NLRB, 502 U.S. 527, 112 S.Ct. 841, 117 L.Ed.2d 79 (1992).
 
 IV. Discriminatory Placement of Kussair
 
 33
 Regarding Kussair, who, it appears, did not participate in the boycott campaign or the efforts to disparage Diamond's product, the Board found that Diamond discriminated against him by placing him in the growers' inspection department instead of offering him a seasonal loader job. We cannot agree, however, that substantial evidence supports the Board's finding that in Kussair's case the General Counsel established "discrimination and a resulting discouragement of union membership" necessary to trigger a section 8(a)(3) violation. Great Dane, 388 U.S. at 32, 87 S.Ct. at 1796; American Ship Bldg., 380 U.S. at 311, 85 S.Ct. at 963-64; Brown, 380 U.S. at 286, 85 S.Ct. at 985. Although Diamond was not aware that Kussair wanted a loader job, it took into account his status as a striker in making his job assignment and therefore discriminated within the meaning of the Act. But in light of the facts that Kussair did not initially ask for a loader job and was offered the job when he asked for it, the discrimination was trivial and could not have had even a "comparatively slight" "tendency to discourage union membership," Brown, 380 U.S. at 287, 85 S.Ct. at 986. See Boilermakers Local 88, 858 F.2d at 761-62 ("It is clear that the Supreme Court intended the phrases 'inherently destructive' and 'comparatively slight' to encompass the universe of employer actions that have any non-trivial, adverse effect on employee rights.") (emphasis added).
 
 
 34
 Diamond decided not to assign any crossover employee to a loader position, fearing that it might give rise to an unfair labor practice charge: the position is a particularly arduous one (requiring, for example, the stacking and unstacking of 30-pound boxes and 55-pound bags throughout the work day) and one its employees often complained about. JA 114, 28. The ALJ found that the loader position "by any objective scale is more onerous and less desirable" than the position to which Kussair was assigned, JA 28, and the Board added that the job is "shunned by most employees," Diamond Walnut, 316 N.L.R.B. at 39. Nevertheless the Board concluded that Diamond should have offered Kussair that position because it paid more than the one he was assigned. Kussair did not initially ask for a loader job on returning to work in September 1993. Within one week of returning, however, he did ask his supervisor, Lexie Whiteman, for a loader job within his department; when Whiteman told him that there were no vacant loader jobs in the department and asked if he wanted to transfer to a different department with a loader vacancy, Kussair declined. JA 24, 169. About a week later Kussair asked Wendy Heinze if he could transfer to a loader job. Heinze told Kussair that the company would accommodate him but Kussair quit before the transfer could take place. Diamond Walnut, 316 N.L.R.B. at 37. On these facts we conclude that the Board's finding that Diamond's treatment of Kussair constituted discrimination that discouraged Union membership is not supported by substantial evidence.[11]
 
 
 35
 * * *
 
 
 36
 For the foregoing reasons we grant Diamond's petition for review and deny the Board's cross-petition for enforcement of its order.
 
 
 37
 So ordered.
 
 
 38
 WALD, Circuit Judge, dissenting in part and concurring in part:
 
 
 39
 It is undisputed that except for their strike-related activities, returning strikers Munoz and Miller would automatically have been considered for the positions of forklift operator and quality control assistant. The record, moreover, amply supports the NLRB's decision that Diamond Walnut ("Diamond") denied these two employees the opportunity to work in preferred jobs without legitimate and substantial business justification. Thus, I would affirm the Board's finding of a National Labor Relations Act ("NLRA" or "Act") violation with respect to these two strikers. In regard to Kussair, however, I agree that there is no evidence to suggest that Diamond would have placed him in a loader position, even absent his strike participation and therefore concur with the panel's decision to reverse the Board's decision with respect to him.
 
 I. THE LEGAL STANDARD
 
 40
 The majority in my view is diverted from the straightforward legal standard governing this case by its near-obsession with the fact that Munoz and Miller did not have a statutory right to reinstatement, per se. The fact is that once they expressed their interest in returning to work, they did have a right to nondiscriminatory treatment with respect to any jobs for which they were qualified. As the majority concedes in one easy-to-miss sentence of text and one footnote, Majority opinion ("Maj. op."), at 489, 493 n. 10, strikers who have unconditionally offered to return to work must be treated "the same as they would have been [treated] had they not withheld their services." Rose Printing Co. & Graphics Comm. Workers Union, 304 N.L.R.B. 1076, 1078, 1991 WL 197152 (1991). Under Rose, workers are "entitled to return to [their prestrike] jobs or substantial equivalents if such positions become vacant, and they are entitled to nondiscriminatory treatment in their applications for other jobs." Id. (emphasis added). If an employer does not treat returning strikers the same as they would have been treated in the absence of the strike, the employer must prove that it acted based on legitimate and substantial business justifications. NLRB v. Fleetwood Trailer Co., Inc., 389 U.S. 375, 378, 88 S.Ct. 543, 545-46, 19 L.Ed.2d 614 (1967); NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 34, 87 S.Ct. 1792, 1797-98, 18 L.Ed.2d 1027 (1967). Only if the employer successfully meets its burden of proving a Fleetwood "business justification" defense (which the Board reasonably concluded Diamond had failed to do in this case) does it become relevant whether the employer's actions were "inherently destructive" of employee rights, in which case the employer has violated the Act regardless of whether or not it acted based on antiunion motivation, Great Dane, 388 U.S. at 34, 87 S.Ct. at 1797-98, or if its actions were only "comparatively slight," in which case a violation will be found only if the employer acted out of antiunion motivation. Id.
 
 
 41
 Diamond admits outright to treating Munoz and Miller differently than it would have if the employees had not participated in the strike. Thus, the critical question in this case is whether Diamond proved that it acted based on legitimate and substantial business justifications. If, and only if, the Board erred on this point, does it become relevant whether the employer's actions were "comparatively slight" or "inherently destructive."
 
 
 42
 At numerous points in the opinion, the majority underscores the absence of any absolute right to reinstatement, and goes on to infer from that absence that Diamond has somehow bestowed a favor on Munoz and Miller by allowing them to return to work at all. For example, the majority writes:
 
 
 43
 We first emphasize what this case does not present. This is not a failure-to-reinstate case.... Rather, the case involves an employer's accommodation of striking union activists, who, at the union's direction and with the union lawyer's guidance, sought to return to work temporarily....
 
 
 44
 Maj. op., at 490 (emphasis added), 493 ("Diamond quickly reinstated the Union activists, who had no statutory right to reinstatement at the time."[1] ). This approach is basically misguided. This case is about employees attempting to exercise a right they maintain when reinstatement to their prior jobs is unavailable--the right to nondiscriminatory consideration for other positions for which they are qualified. In this case, Diamond has admitted that it discriminated against certain returning strikers (those who maintained their affiliation with the Union) in considering their applications for new positions. The majority errs fundamentally when it gratuitously awards Diamond bonus points for giving these workers jobs at all. In fact, Diamond was legally bound to treat them like any other employees--no better, no worse.
 
 
 45
 The majority also makes much of the fact that the returning strikers in this case were motivated by their interest in lobbying for the Union's cause at the jobsite, rather than with promoting the general welfare of the employer. Maj. op. at 487-488, 490. Even if true, the employees' motivations for returning to work in no way license the employer to discriminate against them on the basis of their strike participation, as long as they submit unconditional offers to return to work. See, e.g., NLRB v. Town & Country Electric, Inc., --- U.S. ----, 116 S.Ct. 450, 133 L.Ed.2d 371 (1995) (Union "salts"--organizers who apply for jobs with the intent to organize at the jobsite--are "employees" under the Act). In this case, Diamond admits that it adopted a "special" scheme for placing those returning workers who had announced their intent to advocate for the Union inside the plant. Diamond concededly refused to place the returning organizers in any position it thought might offer them the opportunity to sabotage the company's product or property, or which might expose the strikers to potential violence at the hands of replacement workers. By refusing to consider the workers for the full range of positions for which they were qualified, Diamond plainly "discriminated" against them within the meaning of Rose Printing Co. The next question, then, which the Board reasonably answered in the negative, is whether Diamond successfully proved a Fleetwood defense by showing that its discriminatory actions were based on a legitimate and substantial business justification?
 
 
 46
 II. LEGITIMATE AND SUBSTANTIAL BUSINESS JUSTIFICATIONS
 
 
 47
 Based on Rose, the Board expressly determined in this case that Diamond did not prove an adequate business justification, and therefore violated § 8(a) when it refused to consider the returning strikers for certain higher-paid jobs for which they were qualified and for which the employer would have considered them, but for their Union activity. Diamond Walnut, 316 N.L.R.B. at 39. If substantial evidence in the record supports this conclusion, we cannot "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). The majority, however, finds that Diamond's articulated concerns by themselves do indeed constitute legitimate and substantial business justifications, and therefore excuse the employer's conceded discrimination. In doing so, I believe the majority misinterprets existing law and ignores the impact of analogous contrary decisions involving differential treatment based on disloyalty or misconduct concerns.
 
 A. The Fear of Violence
 
 48
 The majority unqualifiedly accepts Diamond's asserted fear of violence by replacement workers against the returning strikers as a justification for deviating from regular placement procedures--even accepting the fact that the actual violence had long-since ceased. Maj. op. at 493. The Administrative Law Judge ("ALJ") found: (1) that most of the violence associated with the strike had occurred in the early months of the dispute, Diamond Walnut, 316 N.L.R.B. at 46 n. 12; and (2) that there was no evidence to suggest that the returning workers had made any threats against replacement workers or that the Union had threatened to sabotage equipment or products, id. at 46. In light of these findings, the ALJ reasonably concluded--and the Board reasonably affirmed--that the employer had not sufficiently justified its special treatment of the workers based on their Union involvement.
 
 
 49
 Reversing the Board, the court today explains that the "replacement workers continued to harbor resentment" toward the strikers. Maj. op. at 493. But animosity between replacement workers and returning strikers is certainly not unusual in the workplace; if comments like those cited by the majority (for example, "[G]ee, what happened if they fell down in the rest room or in the locker room," Maj. op. at 491) are enough to justify an employer's discriminatory treatment, the NLRA's guarantee against strike-related retaliation will indeed ring hollow.
 
 B. The Fear of Sabotage
 
 50
 The majority's second justification for Diamond's actions--the company's stated fear of sabotage--is equally gossamer. In Willmar Electric Service, Inc. v. NLRB, 968 F.2d 1327, 1331 (D.C.Cir.1992), we identified, but left for another day, the question of when an employee's ties to a union establish such a risk of disloyalty as to justify the (nonunion) employer's rejection or dismissal of the worker on that ground. The majority reaches out for that question today, deciding, in this case at least, that an employer can discriminate against a worker based on mere fears of sabotage conspiracies for which there is no evidentiary support whatsoever apart from the worker's endorsement of an ongoing strike.
 
 
 51
 The dispositive fact on this issue, in my view, is the employer's complete failure to produce a shred of evidence of intent to sabotage on the part of Munoz, Miller, or Kussair. The majority glosses over this critical fact by citing, as support for Diamond's fears of sabotage, the text of a vitriolic letter for which the Union had disavowed any responsibility and which not a smidgen of evidence suggests was penned by one of the returning workers (and to which, for that reason, the ALJ reasonably assigned no weight in this matter). Maj. op. at 491 n. 8.
 
 
 52
 So, not only is the record in this case utterly devoid of any evidence identifying these individuals as a physical threat to the company, but to the contrary, the record reveals that they received good pre-strike reviews; that they had never been accused of writing or distributing the single letter Diamond challenges as unprotected activity; and that they are not alleged to have threatened the employer or to have themselves been threatened by replacement workers. To support its theory of disloyalty, the majority can point only to Miller's and Munoz's admitted participation in a cross-country bus tour to disseminate negative information about the employer's labor policies and to encourage a boycott of Diamond walnuts--both protected activities, as the ALJ specifically found. Diamond Walnut, 316 N.L.R.B. at 47 ("I conclude that the statements made by strikers or the Union representing them in the instant case are linked to the labor dispute in question. Furthermore, the fact that they may be biased or contain hyperbole does not render them unprotected.").
 
 
 53
 A review of prior cases addressing employee disloyalty reveals that the majority has gone far beyond existing legal benchmarks for employers' discriminatory treatment of workers suspected of insurrection. Their opinion contains a strong implication that a returning worker must somehow disavow her support for an ongoing strike in order to be considered for employment on equal footing with other employees. See Maj. op. at 490 (distinguishing this case from one in which an employee either "[seeks reinstatement] after the strike is over or withdraws his support of the strike and crosses the picket line in order to earn a living"). That is not the law. There is Supreme Court precedent that an employer can justify the decision to dismiss a union employee on disloyalty grounds only where the employee is personally responsible for disloyal activity. In NLRB v. Local Union No. 1229, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953) (Jefferson Standard ), the Court wrote: "In such cases, it often has been necessary to identify individual employees ... and to recognize that their discharges were for causes which were separable from the concerted activities of others whose acts might come within the protection of § 7." Id. at 474, 74 S.Ct. at 177-78 (emphasis added). Even though Diamond argues that it could reasonably assume that the Union was responsible for the one tasteless letter to customers (since the letter claims to be from the "original and united worker's [sic]," Joint Appendix ("J.A.") 376), it does not even allege personal involvement on the part of these three employees.[2]
 
 
 54
 The Supreme Court very recently issued another decision rejecting an employer's attempt to infer disloyalty merely from its employee's union activity. In NLRB v. Town & Country Electric, Inc., --- U.S. ----, 116 S.Ct. 450, 133 L.Ed.2d 371 (1995) ("T & C "), the employer argued that the NLRA did not offer full protection to applicants who intended to conduct on-site organizing for a union. The employer there, like Diamond here, worried that these organizers "might try to harm the company ... perhaps disparaging the company to others, perhaps even sabotaging the firm or its products." Id. at ----, 116 S.Ct. at 456.
 
 
 55
 In rejecting the employer's contention that applicants who are also union organizers are not to be allowed the same protection as other "employees" within the meaning of the Act, Justice Breyer, writing for a unanimous Court, pointed out several "serious problems" with the employer's argument. Each of these "problems" is present in Diamond's case to at least as great a degree as in Town & Country. First, the Court noted that "nothing in this record suggests that such acts of disloyalty were present, in kind or degree, to the point where the company might lose control over the worker's normal workplace tasks." Id. In the Diamond case, not only is there no evidence of any acts of disloyalty on the part of the returning workers, but the employer's Director of Human Resources expressly admitted that whether or not the individual workers had personally engaged in strike misconduct played no part in the determination of job placements. Testimony of Vince Brown, J.A. 214-15.[3] Of course, if these workers did not engage in any misconduct, then Diamond's treatment of them amounts to a penalty merely for engaging in protected activity. But an employer cannot lawfully punish its workers in this way; "After all, the employer has no legal right to require that, as part of his or her service to the company, a worker refrain from engaging in protected activity." T & C, --- U.S. at ----, 116 S.Ct. at 456.
 
 
 56
 Second, the Court found that "the argument proves too much," because the dangers of disparagement and sabotage are not limited to union organizers. Id. "[I]f an overly zealous union organizer might hurt the company through unlawful acts, so might an unpaid zealot (who may know less about the law), or a dissatisfied worker (who may lack an outlet for his grievances)." Id. Likewise, in the case before us, there is no reason to believe that these returning strikers are more likely to sabotage the company than other returning strikers who had disassociated themselves with the strike and who admittedly received different treatment. In fact, logic would suggest that a striker returning with the express intent of wooing replacement workers to support the Union would go out of her way to minimize the possibility of reflecting poorly on the Union. It is beyond my ken why a worker who has never been accused of engaging in acts of disloyalty or sabotage would suddenly choose to drive a forklift into a company building at the very time she is trying to make a good impression on the replacement workers.[4]
 
 
 57
 Finally, the unanimous Town & Country court noted that the law offered the employer alternative remedies to respond to its concerns. For example, "[a] company faced with unlawful (or possibly unlawful) activity can discipline or dismiss the worker, file a complaint with the Board, or notify law enforcement authorities." Id. at ----, 116 S.Ct. at 457. This observation seems particularly relevant in Diamond's situation, where one of the company's "legitimate and substantial justifications" is its concern that replacement workers will attack the returning strikers. Diamond could minimize this concern in any number of ways without punishing the potential "victim" of the violence: the employer could institute stringent guidelines prohibiting violent behavior, could dismiss rowdy replacement workers, or could call the police if it suspected actual foul play. To the extent that the majority holds that fear of retaliatory violence alone constitutes a Fleetwood defense, it portends employer discrimination against returning workers at the end of a strike as well as during it. Thus, the court today adjusts an employee's rights under the NLRA depending on his or her popularity among nonstrikers. Such a view is clearly contrary to the Act's purposes of "protecting the right of employees to organize for mutual aid without employer interference, and encouraging and protecting the collective-bargaining process." Id. at ----, 116 S.Ct. at 454 (citations omitted).
 
 
 58
 Of course, striking employees who engage in serious misconduct while on strike lose the protections of the Act and are not entitled to reinstatement. See Medite v. NLRB, 72 F.3d 780, 790 (10th Cir.1995). However, "an employer's determination not to reinstate a striker must be based on evidence that the striker personally engaged in strike misconduct." Id. (citing Midwest Solvents, Inc. v. NLRB, 696 F.2d 763, 765 (10th Cir.1982)); see also NLRB v. Augusta Bakery Corp., 957 F.2d 1467, 1477 (7th Cir.1992) ("To lawfully deny an employee reinstatement at the conclusion of the strike on this ground, an employer must produce evidence connecting the discharged employees to specific strike misconduct."). No such evidence exists with respect to Munoz, Miller, and Kussair, and the majority has neglected to explain why a justification that would clearly fail to excuse a refusal to reinstate workers, Maj. op. at 493 n. 10, does not also fail to justify a refusal to treat workers nondiscriminatorily.
 
 1. Alfonsina Munoz
 
 59
 Munoz worked as a year-round lift truck operator before the strike, and the parties agree that Diamond had a vacant position as a seasonal lift truck operator available at the time she crossed the picket line. Diamond admits that Union-related considerations--specifically, the fear of her union sympathies inciting violence or leading her to engage in sabotage--prevented the employer from placing her in the seasonal forklift position and resulted in her assignment instead as a "cracker" in the growers' inspection department. As a cracker, it was her job to crack open 17,000 grams of walnuts per day at a pay rate of $5/hour. The parties stipulated that she was qualified to work as a lift truck operator, and that she would have made from $7.50 to $10 per hour at that job. Nevertheless, Diamond refused to consider her for the more lucrative position, for fear that her presence in that job would incite others to violence or would allow her to cause damage with her lift truck.
 
 
 60
 For the reasons already articulated, I do not believe Diamond's unsubstantiated fear of violence constitutes a legitimate and substantial business consideration. Similarly, I believe that the Board correctly rejected Diamond's sabotage fears as a Fleetwood defense. Without evidence, the notion that Munoz would act out a sabotage plan simply because of her Union sympathies is not adequate to allow discriminatory treatment.
 
 
 61
 "As for Munoz," the majority notes, "although she was qualified to fill a vacancy as a lift truck driver, Diamond legitimately decided not to put her behind the wheel of the 11,000-pound vehicle. Not only did the lift truck driver move about the plant unsupervised, the truck itself, with an inattentive operator, could cause damage inside the plant." Maj. op. at 492. Notably, neither the majority nor Diamond points to any evidence that Munoz had ever made a threat against the company, or had ever engaged in sabotage activities. The only evidence Diamond cites is Munoz's undenied involvement in the strike and boycott campaign, which included distribution of leaflets critical of the employer. See J.A. 272, 309, 313. Clearly, a striking employee's expression of disagreement with the employer's labor policies is not enough to justify the employer's decision to discriminate against that worker when she returns to the job. In fact, preventing an employer from engaging in just this sort of retaliation is what the NLRA is all about. Thus, without something more, I cannot buy into the majority's assumption that a striker who handed out union-sponsored handbills, but who now wants inside the plant in order to campaign for an election, presents a danger of going on a rampage with an 11,000-pound vehicle.
 
 2. Willa Miller
 
 62
 Miller worked as a year-round quality control supervisor before the strike, but was appointed to a position as a packer when she returned to Diamond. As a packer, Miller spent her days stuffing one-pound bags of walnuts into large boxes. The parties stipulated that there were positions available as quality control assistants, that she was qualified for them, and that she would have made thirty-two cents more per hour in one of those placements. Diamond explains Miller's assignment as a packer primarily in terms of the company's sabotage considerations, and secondarily based on the fear of violence against her. See Brief for Petitioners at 31-33.
 
 
 63
 As for the sabotage concerns, the employer is on only slightly firmer ground with respect to Miller than with respect to Munoz. In an analysis that applies to Munoz as well as Miller, the court notes that both women fully supported the Union's boycott campaign, and from this concludes that, "Diamond knew of Munoz's and Miller's track record of attempting to damage Diamond economically." Maj. op. at 492. Because of her desire to harm the employer economically, the majority apparently infers that Miller might abuse a quality control position to "sabotage" Diamond's product, by turning a blind eye when rotten nuts passed her way. Although this sort of "passive" sabotage is somewhat more fathomable than the "active" version required for Munoz's hypothetical forklift frenzy, Diamond has still failed to introduce any evidence suggesting that Miller in particular might have any tendency to engage in this conduct. What Diamond actually knew about these workers was not that they intended to harm Diamond, but simply that they supported the strike and had engaged in protected strike activity.
 
 
 64
 Thus the Board reasonably determined that an employer's mere speculation that Union sympathies might lead a previously commendable worker to commit sabotage does not meet the Fleetwood standard. And "unless the NLRB has clearly ... misperceived the facts, we will not second-guess its judgment." Randall v. NLRB, 687 F.2d 1240, 1245 (8th Cir.1982).
 
 3. Mohammed Kussair
 
 65
 Mohammed Kussair worked as an air separator operator before the strike. The parties stipulated that there were no permanent or seasonal jobs available in this position when Kussair returned to work. Diamond placed him instead as a cracker in the growers' department, where he had never worked before. The parties also stipulated that there were loader positions available at the time Kussair returned to work, and that he would have made $1 more per hour at that job. Kussair's supervisor, whose testimony the ALJ specifically credited, testified that Kussair at some point asked to be transferred to a loader job and was offered a position, which he declined, as a loader in another department. On October 6, when Kussair again asked to transfer to a loader position, his supervisor told him that he could do so on the 8th of the month. Before he could take advantage of the transfer, however, he resigned from Diamond and rejoined the strike.
 
 
 66
 The ALJ also specifically credited the employer's witness, who testified that Diamond had not placed returning workers in the loader positions because those jobs, which many workers considered particularly onerous, required the employee to lift heavy boxes and bags all day. Even though the employer cannot lawfully consider Kussair's Union activity as a justification for denying him a position, the particular facts in Kussair's case do not justify the Board's determination that Diamond discriminated against Kussair. Kussair did not initially ask to be a loader; he was not a loader at the time he went on strike; he was told he could transfer into a loader spot and he refused; and the employer could not have known that he would have preferred a strenuous job over a tedious one. Since there was no discriminatory treatment to begin with, the fact that the ALJ rejected the employer's Fleetwood defense is irrelevant; there has been no NLRA violation.
 
 
 67
 In the growers' department, Kussair had trouble meeting his 17,000 grams/day quota, and received oral reprimands three times during his first two weeks. After the third reprimand, he hollered at his supervisor and was given a written reprimand. The Board ordered that the written reprimand be removed from his files, because it "was the product of the unlawful job assignment." J.A. 18. Since the evidence does not support the conclusion that the assignment was unlawful, the order regarding the reprimand must be reversed as well.
 
 III. CONCLUSION
 
 68
 Contrary to established legal precedent, the majority today approves penalties leveled at returning workers based on mere speculation that the workers--whom the employer admits had good records with the company and about whom the employer had no individualized concerns--will sabotage the company's product or themselves become the victims of co-worker violence. Unlike the majority, I believe that the Board correctly applied the law to the facts when it decided that Diamond had violated the NLRA. The record amply supports the Board's conclusion that these workers did not pose a serious threat to the purity of Diamond brand walnuts or to the safety of either themselves or their fellow employees. We should therefore deny Diamond's petition for review of the Board's order.
 
 
 
 [1]
 Before striking, Miller was a quality control supervisor, Munoz drove a lift truck and Kussair operated an air separator machine. All three jobs were permanent but were not available in September 1993. Although a seasonal lift truck driver job was available when Munoz returned, the seasonal job was not substantially equivalent to the permanent one. Diamond Walnut Growers, Inc., 316 N.L.R.B. 36, 37, 1995 WL 25644 (1995)
 
 
 [2]
 At the hearing below, Kussair was asked, "And did you know when you went to work inside the plant that you would only work up until the vote and then you'd go back on strike." He answered in the affirmative. Diamond Walnut Growers, Inc., Transcript of March 1994 Hearing Before Administrative Law Judge, at 241. Munoz likewise was asked, "And was it your understanding you were only going to go in for a limited time period and then quit when the vote happened?" She answered in the affirmative. Id. at 218. Apparently Miller was not asked the question but the Board does not contend that she had any intention of remaining past the election
 
 
 [3]
 Each resignation letter stated: "This is to inform you that I have decided to resume the strike against Diamond effective immediately. Working here over the past couple of weeks has convinced me that conditions have significantly deteriorated and I must continue the Union's efforts to bring decency and respect to the long-term workers of Diamond. Henceforth I will not be crossing the picket lines." JA 712
 
 
 [4]
 Section 8(a)(3) makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment ... to ... discourage membership in any labor organization" 29 U.S.C. § 158(a)(3). Section 8(a)(1) makes it an unlawful labor practice "to interfere with, restrain or coerce employees in the exercise" of their statutory rights. 29 U.S.C. § 158(a)(1). A violation of section 8(a)(3) automatically constitutes a violation of section 8(a)(1). International Bhd. of Boilermakers, Local 88 v. NLRB, 858 F.2d 756, 761 (D.C.Cir.1988)
 
 
 [5]
 The Board argues:
 The Company erroneously asserts that the Board found its placement of Miller, Munoz and Kussair to be conduct "inherently destructive" of statutory rights.... The Board, however, never determined the Company's conduct to be "inherently destructive".... As shown above, the Board's theory here is simply that the Company discriminated against the former strikers in considering them for vacancies and failed to provide any legitimate and substantial business justification.
 Brief for Board at 26 (citations omitted). There is no indication of record that the replacement workers knew the jobs Miller, Munoz and Kussair held before they struck and therefore the replacements had no reason to believe the returning strikers were being treated discriminatorily based on their pro-Union actions.
 
 
 [6]
 Judge Wald reads far too much into Town & Country. See Opinion dissenting in part and concurring in part at 7-9. There the Supreme Court simply confirmed what this Court had previously held in Willmar Elec. Serv., Inc. v. NLRB, 968 F.2d 1327, 1330-31 (D.C.Cir.1992), cert. denied, 507 U.S. 909, 113 S.Ct. 1252, 122 L.Ed.2d 651 (1993): A paid union organizer can be an "employee" protected by the Act. No one disputes that Miller and Munoz were "employees" protected by the Act. The issue here is, given their status as "employees" protected by the Act's anti-discrimination provision, did Diamond have a legitimate and substantial justification for the job assignments it gave them? In Town & Country, moreover, the employer raised the risk of sabotage not to assert a Fleetwood defense but to argue that "Congress could not have meant paid union organizers to have been included as 'employees' under the Act." --- U.S. at ----, 116 S.Ct. at 456. Indeed, the Supreme Court declined to "express any view about ... whether or not [the employer's] conduct (in refusing to interview, or to retain, 'employees' who were on the union's payroll) amounted to an unfair labor practice." Id. at ----, 116 S.Ct. at 457 ("We hold only that the Board's construction of the word 'employee' is lawful....")
 
 
 [7]
 In a letter to "fellow co-workers" regarding the return of the Union activists, Bubeck stated in part:
 They [strikers] have threatened us--Intimidated us--Called us every name in the book--And even destroyed our property ... But ... Let's not stoop to their level of immaturity. They may still say things that piss you off; but PLEASE for the sake of all of our futures here at Diamond Walnut let's keep cool and level-headed in our everyday dealings with these people.
 JA 278 (emphasis in original).
 
 
 [8]
 In addition, Diamond's customers and, it appears, the United States Department of Health and Human Services received a letter including the following (false) message:
 Many of the workers that have actually replaced us, the striker's [sic] of Diamond Walnut, are people whom [sic] have police records as being drug addicts, drug dealers, alcoholics and even prostitutes. Through blood testing of workers who have broken the picket line, many of them having bad records, it would be found that there is a significant amount of positive results like the detection of the AIDS virus, Sifillis [sic], Gonorrea [sic], Hepatitis and other contagious diseases with high risk of contamination to the public.
 JA 374-75 (emphasis added). Notwithstanding the highlighted language as well as the signature line which read "The Original and United Workers of Diamond Walnut," the Union disavowed responsibility for the letter and the ALJ gave it no weight.
 
 
 [9]
 In Sunland the Board emphasized that the agent was paid by the union. 309 N.L.R.B. at 1231 n. 41. If the returning worker is not on the union's payroll, the Board noted, "it cannot necessarily be presumed that [he] will be seeking to further the union's object of depriving the employer of employee services during the strike.... [E]mployers [do not] have carte blanche to refuse to permit prounion employees to return to work during a strike...." Id. Diamond, however, did not refuse to permit Munoz and Miller to return to work, did not seek to use carte blanche authority and did not merely presume that Miller and Munoz qua Union backers would seek to further Union objectives
 Assuming without concluding that there is a decisive difference between the paid agent in Sunland and Miller and Munoz, we note that Sunland upheld the employer's failure to hire. But Diamond did not fail to reinstate; instead it merely assigned the returning strikers to non-sensitive positions during their temporary stint inside the plant.
 
 
 [10]
 We do not suggest that on the facts of this case Diamond could have lawfully refused to consider Miller and Munoz for vacancies for which they were qualified simply because neither their former jobs nor substantially equivalent ones were available. As noted, although an economic striker's right to reinstatement extends only to an equivalent or substantially equivalent job, the striker is nonetheless entitled to nondiscriminatory treatment when he applies for any job for which he is qualified. Rose Printing and Laidlaw, supra; cf. Diamond Walnut, 316 N.L.R.B. at 38
 
 
 [11]
 The Board found that Diamond also discriminated against Kussair by reprimanding him: after receiving three warnings for not meeting job performance requirements, Kussair inappropriately addressed his supervisor and was reprimanded. In effect the Board concluded that Kussair would not have been reprimanded but for his unlawful assignment to the growers' inspection department. Because we reverse the Board's finding of discriminatory placement, we also reverse its discriminatory reprimand finding
 
 
 [1]
 Of course, Diamond did not actually reinstate the workers, since it did not place them in the same or substantially comparable jobs as those they performed before the strike. But this case is not about reinstatement. This case is about Diamond's admitted discrimination against returning strikers in considering their applications for new positions
 
 
 [2]
 Furthermore, even if Diamond believed in good faith that the specific employees wrote the offending letter, it would not be justified in discriminating against the strikers if in fact the employer was mistaken. See NLRB v. Burnup & Sims, Inc., 379 U.S. 21, 23, 85 S.Ct. 171, 172-73, 13 L.Ed.2d 1 (1964). In Burnup, the Court explained that such a good faith exception could discourage legitimate union activity: "Union activity often engenders strong emotions and gives rise to active rumors. A protected activity acquires a precarious status if innocent employees can be discharged while engaging in it, even though the employer acts in good faith." Id. at 23, 85 S.Ct. at 173. Cf. Coca-Cola Bottling Co., 186 N.L.R.B. 1050 (1970)
 
 
 [3]
 Vince Brown, Diamond's Director of Human Resources, gave the following testimony:
 Q: So, I take it, that wasn't a factor in your determination as to what positions these individuals should be placed in; is that fair to say?
 A: Whether or not they were involved in strike misconduct?
 Q: Yes.
 A: I don't think that was a factor, no.
 
 
 [4]
 I also see no reason to assume that the replacement workers are more likely to act out against Munoz, Miller, or Kussair than against the Union activists picketing in front of the company gates